UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 10-281 (DWF/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Kevin Devon Wallace,** | |
| Defendant. | |

Allen A. Slaughter, Jr., Assistant United States Attorney, for Plaintiff.
Manvir K. Atwal for Defendant.

**THIS MATTER** came before the undersigned United States Magistrate Judge on November 10, 2010 on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 16) and Defendant's Motion to Suppress Statements, Admissions and Answers (ECF No. 17). At the hearing, the Government offered testimony from Daniel Ledman and Gregory Freeman, and the Court received three exhibits into evidence.[1] The parties have since submitted post-hearing briefs. (ECF Nos. 31 and 33.)

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, the Court recommends Defendant's suppression motions be **GRANTED, in part,** and **DENIED, in part**.

### I. FINDINGS OF FACT

---

[1] Government Exhibit 1 is a photocopy of a "Minneapolis Police Department Consent to Search Receipt and Inventory" form; Government Exhibit 2 is an audio recording of Defendant's June 7, 2010 interview with Sergeant Freeman; and Government Exhibit 3 is an excerpt from the June 7, 2010 interview transcript (pages 15 through 26).

A.      **Defendant's Post-Arrest Statements**

   1.      **Testimony of Officer Daniel Ledman**

At the hearing in this matter, Minneapolis Police Officer Daniel Ledman testified regarding his interactions with Kevin Devon Wallace ("Defendant") on June 7, 2010.

Officer Ledman testified that, at around 3:00 a.m. on that date, while on patrol with his partner, Melinda Olson, in the area of Lowry and Irving Avenue North in Minneapolis, he observed a red, Monte Carlo "go through a stop sign." (Tr. 7-8.) He and his partner initiated a traffic stop, at which time Defendant (the driver of the vehicle) and the passenger exited the vehicle. (Tr. 8.) Officer Olson yelled "for the two to get back in the vehicle." (Tr. 9.) The passenger complied with the instruction, however, Defendant "continued [to] walk away." (Tr. 9.) Officer Ledman suspected that Defendant "was going to attempt to flee on foot" and proceeded to "physically detain" him. (Tr. 9-10.) The officers handcuffed Defendant and placed him in the back of their squad car, after which they learned from "DVS" that neither Defendant nor the passenger had a valid driver's license. (Tr. 10.) Officer Ledman then informed Defendant that he was under arrest for gross misdemeanor Driving After Cancellation–IPS (inimical to public safety). (Tr. 10.) At no point did Officer Ledman provide Defendant with a *Miranda* advisory. (Tr. 38.)

Officer Ledman testified that, while they waited approximately 20 to 25 minutes for the tow truck to arrive, Defendant "began to plead with [Officer Ledman] not to take him to jail for the driving offense." (Tr. 11.) According to Officer Ledman, Defendant repeated the request multiple times. (Tr. 11.) He also offered to organize a weapons buy for the officers "[s]everal times over and over again." (Tr. 12.) Officer Ledman testified that Defendant provided him with concrete information, including a description of a vehicle as well as a description of "the people who were going to bring the guns and sell the guns to him" at a specific address on Upton Avenue North in

Minneapolis. (Tr. 12-13, 16.) Officer Ledman further stated: "I might have asked him if there were -- or how many people were in the house, but I don't believe he knew exactly." (Tr. 28.) After speaking with his sergeant, Officer Ledman agreed to work with Defendant in exchange for which he informed Defendant that he "would not book him for cancelled IPS." (Tr. 13.)

The three individuals then drove to the Upton Avenue address, and, somewhere near the residence, the officers removed Defendant's handcuffs. (*See* Tr. 16.) Officer Ledman was able to corroborate much of the information provided by Defendant, including the vehicle description he had given. (*See* Tr. 14, 27-29.) Based upon some uncertainties as to which vehicle would be utilized for the weapons sale, however, the officers ultimately abandoned the plan and proceeded to the precinct "to book Defendant for the cancelled IPS." (Tr. 29-30.) At that point, Defendant offered to turn over his own weapon and provided law enforcement with his apartment number at an address on First Avenue South.[2] (Tr. 14, 30-31.) Officer Ledman then retrieved a consent form from the police station and filled out the form with the specific apartment number and address on First Avenue South. (Gov't Ex. 1; Tr. 30.)

On their way to the second address on First Avenue South, Officer Ledman testified that he then "heard [Defendant] saying the address in the back seat and I asked him, why are you saying 18** Em Stately[?] He said that was where the weapon actually was located."[3] (Tr. 16.) Officer Ledman subsequently crossed out the First Avenue address and wrote "18** Em Stately #2 Mpls, MN" in the margin of the consent form. (Gov't Ex. 1; Tr. 15, 16.) Defendant told Officer Ledman

---

[2] Officer Ledman further testified that, after abandoning the initial plan, Defendant asked: "so you mean if I can guarant[ee] you a gun, you will not bring me to jail for the inimicable to public safety? . . . . You mean to tell me, if I get you a gun, you will not bring me to jail for that crime[?]" to which Officer Ledman "said yes." (Tr. 39.)

[3] Officer Ledman later testified, however, that, in the one-and-a-half hour period between the traffic stop and the ultimate recovery of the gun, he did not ask Defendant any questions. (Tr. 38-39.)

3

that, in addition to "staying at" the address on First Avenue South, he lives at the apartment on Em Stately Street with his girlfriend. (Tr. 31.)

When they arrived at Defendant's apartment on Em Stately, Defendant exited the squad car and signed the consent form. (Tr. 16, 35.) In addition to authorizing a search of the premises by Officers Ledman and Olson, the consent form further states, above the signature line: "These officers are authorized by me to take from my apartment any letters, papers, materials or other property that they may desire. This written permission is being given by me to the above named police officers voluntarily and without any threats or promises of any kind." (Gov't Ex. 1.) Before entering the apartment, Officer Ledman told Defendant that, if everything went as expected and the officers retrieved a gun, Defendant would be released at the scene. (Tr. 35.)

The officers, along with back up law enforcement, accompanied Defendant to the front door of the building. (*See* Tr. 17.) Defendant then repeatedly kicked the front door in order to wake his girlfriend, Marlene Woods, to let them inside. (Tr. 17, 32; *see* Gov't Ex. 1.) Eventually, Ms. Woods opened the door and Defendant stated: "they're here for the gun" and proceed upstairs and into the apartment with the officers. (Tr. 17.) In the apartment, an argument erupted between Defendant and Ms. Woods as to the location of the gun. (Tr. 18.) Officer Ledman testified that Defendant then asked everyone to leave the apartment, with the exception of Officer Ledman. (Tr. 18-19.) Defendant ultimately told Officer Ledman that the gun was located inside a sock on the top shelf of an entryway closet. (Tr. 19.) According to Officer Ledman, Defendant was yelling: "get the gun and get out." (Tr. 19.) Apparently, Defendant became "very agitated," and officers grew concerned for the safety of two children in the apartment and ultimately handcuffed Defendant inside the apartment. (*See* Tr. 19-20, 34.) Officer Ledman testified that he recovered a Glock 9mm, semi-automatic handgun along with "[a] magazine with live ammunition" as Defendant was

"simultaneously" handcuffed. (Tr. 20; Gov't Ex. 1.)

Officer Ledman later learned from "dispatch" that the weapon had been stolen. (Tr. 20.) He called his sergeant, who had "done a check" on Defendant and informed him that Defendant had prior felony convictions. (Tr. 21.)

### 2. Testimony of Sergeant Gregory Freeman

Minneapolis Police Sergeant Gregory Freeman interviewed Defendant at about 11:00 a.m. on June 7, 2010 at the Hennepin County Jail. (Tr. 42-43.) Sergeant Freeman advised Defendant of his *Miranda* rights, each of which Defendant acknowledged he understood. (*See* Gov't Exs. 2 and 3.) Sergeant Freeman recorded the interview, during which Defendant admitted leading the officers to the gun. (Tr. 44-46, Gov't Exs. 2 and 3.) Sergeant Freeman testified that, at the time of the interview, Defendant did not appear groggy or under the influence of alcohol or drugs. (Tr. 43-44.) Defendant never asked to terminate the interview and never asked for counsel. (Tr. 45-46.)

Defendant was ultimately indicted as a felon in possession of a firearm. (Indictment, ECF No. 1.)

## II. CONCLUSIONS OF LAW

### A. Defendant's Statements to Officer Ledman Must Be Suppressed.

Defendant seeks to suppress all statements made to Officer Ledman during the one and half hours following his arrest for the traffic offense. (*See* ECF No. 31 at 8.)

#### 1. Custodial Interrogation Standard

A *Miranda* warning is required only when a suspect is subjected to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 467–68 (1966). A custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Interrogation "refers

not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995), provides a two part test for determining whether an interrogation occurs in custody. The court must inquire: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 112. The test focuses on how a "reasonable person in the subject's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). Still, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving of [sic] *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation omitted) (recognizing the validity of considering the "totality of the circumstances" in determining whether a suspect is in custody).

### 2. Defendant Was Subjected to Custodial Interrogation When He Spoke to Officer Ledman.

After conducting a traffic stop on the vehicle driven by Defendant, Officer Ledman and his partner restrained and handcuffed Defendant and placed him in the rear of their squad car. (Tr. 9-10.) At that time, Officer Ledman informed Defendant that he was under arrest for gross misdemeanor driving with a cancelled license. (*See* Tr. 10.) Clearly Defendant was in custody, and the Government does not argue otherwise. As Officer Ledman did not provide Defendant with a *Miranda* advisory at that time or at any time thereafter (Tr. 38), the question becomes whether

Officer Ledman interrogated Defendant, as that term is defined in the *Miranda* jurisprudence. The Court concludes he did. Officer Ledman proceeded to entertain Defendant's efforts to facilitate a weapons buy, and engaged him in a conversation related to the recovery of a gun. Although Officer Ledman denied expressly questioning Defendant at any point during their one-and-a-half-hour long interaction (Tr. 11, 25, 27, 39), the Court finds that Officer Ledman interrogated Defendant when he asked him at least two follow up questions related to the acquisition of a gun: "I heard him saying the address in the back seat and I asked him, why are you saying 18\*\* Em Stately[?] He said that was where the weapon actually was located." (Tr. 16); and "I might have asked him if there were -- or how many people were in the house, but I don't believe he knew exactly." (Tr. 28.)

The Court concludes that such admitted questioning, together with the discussion necessary to attempt to set up the gun retrieval, amounted to custodial interrogation. Officer Ledman knew or should have known that the entire discussion was "reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980). Because Defendant was in custody upon his arrest for the driving offense and subjected to interrogation in the squad car, the failure to provide him with a *Miranda* warning requires that all of Defendant's statements to Officer Ledman be suppressed.

**B.     Defendant's Statements to Sergeant Freeman Are Admissible.**

Defendant also seeks to suppress his statements to Sergeant Freeman. He concedes, however, that he responded to questioning after Sergeant Freeman provided him with a *Miranda* warning. (*See* ECF No. 31 at 12.)

    **1.     Standard for Waiver of *Miranda* Rights**

In order for evidence obtained as a result of custodial interrogation to be used against a defendant at trial, the Fifth Amendment requires that law enforcement advise the individual of his

constitutional rights and that he make a valid waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Before questioning begins, a suspect in custody must be informed of the following: (1) that he has the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed. *Id.* at 444, 469–70, 478–79. Law enforcement officials must use either this formulation of the warnings or "other procedures [that] are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." *Id.* at 467. After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must stop. *Id.* at 473–74. Statements elicited from a suspect in violation of *Miranda* are inadmissible. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

Once advised of his *Miranda* rights, a suspect's waiver of his Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made. *Miranda*, 384 U.S. at 444; *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002); *see also Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259–60 (2010). A waiver is made knowingly if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. It is the Government's burden to show by a preponderance of evidence that the suspect's waiver meets these standards. *Miranda*, 384 U.S. at 473; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

In order to invoke one's Fifth Amendment right to counsel, a suspect must do so unambiguously. *Thompkins*, 130 S. Ct. at 2259–60 ("If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke

his or her *Miranda* rights."), citing *Davis v. United States*, 512 U.S. 452, 461–62 (1994).

Similarly, a suspect's invocation of the right to silence must be unambiguous. *See Thompkins*, 130 S. Ct. at 2260 ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning . . . . Here he did neither, so he did not invoke his right to remain silent.") (quotation omitted); *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007) ("Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*."). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Thompkins*, 130 S. Ct. at 2262 (citations omitted). Still, "[i]f the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights . . . . The prosecution must make the additional showing that the accused understood these rights." *Id.* at 2261.

**2.     Defendant Knowingly and Voluntarily Waived His *Miranda* Rights at the Jail.**

Sergeant Freeman informed Defendant of his *Miranda* rights before questioning him at the jail. (Tr. 44-46, Gov't Exs. 2 and 3.) Defendant separately indicated that he understood and waived each of the rights as recited to him. (Gov't Exs. 2 and 3.) Sergeant Freeman also testified that Defendant did not appear groggy or under the influence of alcohol or drugs at the time of questioning. (Tr. 43-44.) At no time did Defendant request an attorney, ask to terminate the interview, or invoke his right to silence. (Tr. 45-46.)

Based upon the foregoing, the Court finds that Defendant knowingly and voluntarily waived

his *Miranda* rights at the time of his interview with Sergeant Freeman on June 7, 2010. Consequently, all statements made to Sergeant Freeman are admissible.

**C.    The Physical Evidence Seized From Defendant's Apartment Is Admissible.**

    **1.    Defendant Provided Voluntary Consent to Search the Apartment.**

Defendant argues that his consent to search was not voluntarily given, requiring suppression of the handgun, magazine and ammunition seized from his apartment on Em Stately Street. (*See* ECF No. 31 at 6.)

"[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). In essence, voluntariness, requires "an essentially free and unconstrained choice by its maker." *Id.* at 225. "In determining whether a defendant's will was overborne in a particular case," the Court must assess "both the characteristics of the accused and the details of the interrogation." *Id.* at 226. The Court may consider: "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." *Id.* at 226 (citations omitted); *see also United States v. Johnson*, 619 F.3d 910, 918 (8th Cir. 2010) ("We consider (1) [Defendant's] age; (2) his general intelligence and education; (3) whether he was intoxicated at the time; (4) whether he was informed of his *Miranda* rights before consenting; (5) whether any previous arrests would have informed him of his rights and protections; (6) the length of time he was detained; (7) whether the officers acted in a threatening manner; (8) whether the police made any promises or misrepresentations; (9) whether the police had [Defendant] in custody or under arrest at the time; (10) whether he consented in public; and (11) whether

[Defendant] was silent during the search.")

Considering the totality of the circumstances, the Court concludes that Defendant's consent to search the apartment was voluntary and was not the product of police coercion. Defendant signed a consent to search form that expressly informed him that he had a right to refuse consent. Moreover, the facts leading up to the giving of consent clearly establish that Defendant's will to resist a search was not overborne by the police.

Defendant does not appear to be of low general intelligence or education and is not of a particularly young age. There is also no evidence that Officer Ledman threatened Defendant in any way or subjected him to any form of physical punishment or intimidation in order to obtain his consent to search. In fact, the evidence shows only that it was Defendant who initiated the events that led to the search. He voluntarily went to great lengths to turn over a weapon to law enforcement in an attempt to avoid being taken to jail for a driving offense. Defendant continued to press officers to retrieve his personal firearm, even after their initial reluctance to conduct a buy at another location.

It is true that Defendant gave his consent to search for the gun in exchange for a promise by the police not to take him to jail for the driving offense. It is equally true, however, that the *quid pro quo* was Defendant's idea. There is no evidence that the officers' decision to take him to jail for the driving offense was anything other than the ordinary response to the situation. Defendant had been found driving a vehicle after his license to drive had been revoked as inimical to public safety. There is no evidence that the police sought to use the threat of jail to coerce Defendant's consent. At the time he gave his consent to search the apartment, Defendant was attempting to persuade the police not to take him to jail for the gross misdemeanor driving offense. His initial offer to arrange for the purchase of a gun from a third party had been unsuccessful. Under the totality of these

circumstances, the Court concludes that there was nothing in the conduct of the police that would have overborne his will to resist a search.[4]

Based upon the totality of the circumstances and in light of the "conduct of the officers and the characteristics of the accused" in this case, although Defendant was under arrest for the traffic offense at the time consent was given, Defendant's will was not overborne in consenting to a search of his apartment. *See United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004). Accordingly, the Court finds that Defendant's consent to search his apartment on Em Stately Street was voluntarily provided. (*See* Gov't Ex. 1.) The physical evidence seized therefrom should not be suppressed.

**2.    The Physical Evidence Seized From Defendant's Apartment Was Not the "Fruit" of His Previous Statements.**

Moreover, the Eighth Circuit has held, in light of *Dickerson v. United States*, 530 U.S. 428 (2000), that "the exclusionary rule as applied under the Fifth Amendment does not require the suppression of physical evidence derived from a voluntary, non-*Mirandized* statement." *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1013, 1019 (8th Cir. 2003) (mandating the "application of a voluntariness standard to determine the admissibility of evidence derived from a *Miranda* violation without discrimination in application of the rule to subsequent statements, witness testimony, or physical evidence"). The Supreme Court has also established, in *United States v. Patane*, that the failure to provide a *Miranda* warning does not compel the suppression of the fruits of a suspect's voluntary statements. 542 U.S. 630, 641–42 (2004).

Although Defendant was in custody and not given a *Miranda* warning, his statements, like the statements of the defendants in *Villalba-Alvarado* and *Patane*, were voluntary. The same

---

[4] The question of voluntariness must be determined at the time Defendant gave his consent. That the police later learned that Defendant was a convicted felon and that the gun was in fact stolen, and that Defendant was ultimately arrested and taken to jail, despite the deal he made with the police, has no bearing on whether the consent, when given, was voluntary.

evidence that establishes the voluntariness of Defendant's consent to search also establishes the voluntariness of his statements. While the Court concludes that Defendant's statements to Officer Ledman must be suppressed because of the *Miranda* violation, as in *Patane*, suppression of the physical evidence seized from the apartment is not warranted.

### III.     RECOMMENDATION

Based upon the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1) Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (ECF No. 16) be **DENIED**; and

2) Defendant's Motion to Suppress Statements, Admissions and Answers (ECF No. 17) be **GRANTED, in part,** and **DENIED, in part,** as follows:

   a) To the extent Defendant seeks to suppress all pre-*Miranda* statements to law enforcement, the motion should be **GRANTED**.

   b) To the extent Defendant seeks to suppress any post-*Miranda* statements to law enforcement, the motion should be **DENIED**.

DATED: December 1, 2010              *S/ Franklin L. Noel*
                                     FRANKLIN L. NOEL
                                     United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **December 15, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen (14) days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and

Recommendation, the party making the objections shall timely order and cause to be filed by **December 15, 2010,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.